**Capital Reporting Company**

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

---------------------------x

MATTHEW INGRAM, JR.,            :

       Plaintiff,       :    1:06-cv-01262

   v.                       :    EGS

THE DISTRICT OF COLUMBIA     :

       Defendant.       :

---------------------------x

           Washington, D.C.

        Tuesday, June 12, 2007

                    `

Deposition of:

        STANLEY MARTIN WALDREN

called for examination by counsel for Plaintiff, pursuant

to notice, at the D.C. Jail, 1901 D Street, S.E.,

Washington, D.C. 20003, before Joseph Kanahele, Jr. of

Capital Reporting Company, a notary public in and for

the District of Columbia, beginning at 12:15 p.m., when

were present on behalf of the respective parties:

          * * * * *

**Capital Reporting Company**

Page 2

```
 1                 A P P E A R A N C E S

 2

 3   On behalf of the Plaintiff:

 4        GEOFFREY D. ALLEN, ESQUIRE

 5        1730 Rhode Island Avenue, N.W.

 6        Suite 206

 7        Washington, D.C.  20036

 8        (202) 778-1167

 9

10   On behalf of the Defendant:

11        CARL J. SCHIFFERLE, ESQUIRE

12        Assistant Attorney General

13        Office of the Attorney General

14        Government of the District of Columbia

15        441 4th Street, N.W.

16        Suite 600 South

17        Washington, D.C.  20001

18        (202) 724-6624

19                         * * * * *

20

21

22
```

**Capital Reporting Company**

Page 3

```
 1                    C O N T E N T S

 2

 3   EXAMINATION BY:                          PAGE

 4      Mr. Allen, Counsel for Plaintiff       4

 5

 6   STANLEY WALDREN DEPOSITION EXHIBITS*     PAGE

 7   1   Memorandum to Dennis Harrison        15

 8       (Acting Warden) from Stanley Waldren

 9       (Major of Operations) dated

10       October 3, 2005

11   2   Email from Stanley Waldren (DOC)      60

12       to Elwood York (DOC) dated

13       October 8, 2005

14   3   Email from Terri Johng (Pentabridges) 63

15       to Dennis Harrison (DOC) dated

16       October 12, 2005

17   4   Memorandum to Dennis Harrison        68

18       (Acting Warden) from Stanley Waldren

19       (Major) dated September 27, 2005

20

21              (*Exhibits attached to transcript.)

22                       * * * * *
```

**Capital Reporting Company**

Page 4

1                    P R O C E E D I N G S

2              WHEREUPON,

3                    STANLEY MARTIN WALDREN,

4        called as a witness, having been first duly sworn,

5    was examined and testified as follows:

6                    EXAMINATION BY COUNSEL FOR PLAINTIFF

7    BY MR. ALLEN:

8        Q    Can you state your name for the record,

9    please?

10       A    Yes, Stanley Martin Waldren.

11       Q    Okay.  And that's Major Waldren?

12       A    No, it's Deputy Warden Waldren.

13       Q    Oh, Deputy Warden, congratulations.

14       A    Thank you.

15       Q    My name is Geoffrey Allen and I'm the

16   attorney representing Matthew Ingram in a lawsuit

17   against the District of Columbia arising out of some

18   events which occurred on September 27th, 2005; and you

19   are not a named defendant in that lawsuit and it is not

20   anticipated that you will be.  However, we believe that

21   you may have witnessed certain events and we're here to

22   ask you some questions about that.  If you don't

**Capital Reporting Company**

Page 5

1   understand my question because of inartful phrasing on

2   my part, please let me know; I'd be happy to rephrase it

3   and try to make it clear, and I prefer you do that

4   rather than attempt to answer a question that's unclear.

5    I don't think this will take too long, probably less

6   than an hour; but, if at any time you wish to take a

7   break, please let me know -- of course, we will

8   accommodate that. You're free to discuss anything you

9   want with Mr. Schifferle while there isn't a pending

10  question.  While there is a pending question -- if

11  you're able to answer it -- I prefer you answer the

12  question; but, in between questions if you wish to

13  confer with Mr. Schifferle, then you are free to do so.

14  And, just a final thing -- I'm sure you know -- this is

15  a deposition; it is being recorded, and so it's helpful

16  if you make your responses verbal rather than headshakes

17  or nods, which is difficult to record.  So, with those

18  ground rules in mind, let's proceed.

19              How long have you worked for the Department

20  of Corrections, sir?

21      A    Since November 1983.

22      Q    Okay.  And did you go in as just a

Page 6

1    correctional officer?

2        A    Yes.

3        Q    And which facilities have you worked at

4    since then.

5        A    My entire tenure was at the Central facility

6    in Lorton.

7        Q    Okay.  And then Central closed when?

8        A    I think it was 2003.

9        Q    2003.  And what rank had you gotten to by

10   the time Central closed?

11       A    Lieutenant -- Security Lieutenant.

12       Q    Okay.  And then you were transferred to D.C.

13   Jail, I take it?

14       A    No.

15       Q    Oh, okay.

16       A    I went to headquarters on Vermont Avenue.

17       Q    Okay.  And how long did you stay there for?

18       A    Approximately about eight months.

19       Q    Okay.  And what did you do there?

20       A    I was kind of a security specialist and

21   labor relations liaison.

22       Q    Okay.

**Capital Reporting Company**

Page 7

1    A    I was also on the closure team.

2    Q    All right.  And that was supervising the

3    closure of other facilities?

4    A    Well, the halfway house was the last one on

5    Vermont Avenue.  No, correction, it was a halfway house

6    on New York Avenue.

7    Q    Okay.  And at some point you came to D.C.

8    Jail, correct?

9    A    Yes.

10    Q    When was that?

11    A    2003 -- October 2003.

12    Q    Okay.  And what rank did you have at that

13    point?

14    A    I made Captain.

15    Q    Okay, all right.  And then by October of

16    2005 you had made Major, correct?

17    A    In July 2004 I made Major.

18    Q    Okay, all right.  What were your duties and

19    responsibilities during, say, September of 2005?

20    A    Management, day-to-day operations of all

21    three shifts within the D.C. Jail.

22    Q    Okay.

Page 8

1        A        Management oversight.

2        Q        Would you make personnel decisions in that

3    capacity?

4        A        Rephrase the question?

5        Q        Well, would you have -- would you take part

6    in decisions as to which officers got assigned to which

7    units?

8        A        No, the Shift Captains do that.

9        Q        Okay.  What type of unit as of September

10    2005 -- what type of unit was South One?

11        A        This is our Special Management Unit; we call

12    it an SMU.

13        Q        Okay.  And what type of inmates end up on

14    South One, or did end up on South One?

15        A        Well, most inmates, they have disciplinary

16    problems; inmates here are because of the U.S. Attorneys

17    on writs; and volatile-type inmates who have assaulted

18    inmates or other staff.

19        Q        Okay.  And would an inmate accused of

20    attacking another inmate, could he find himself on that

21    unit at that time -- South One; I'm thinking

22    particularly in terms of, you know, just to make the

Page 9

1    question more specific -- Mathew Ingram, I believe, was

2    accused of murdering another inmate?

3        A    Yeah, but I think he was here on a writ --

4    yeah.

5        Q    Okay, all right.  So you think that the

6    reason that Ingram was in South One was because of a

7    writ?

8        A    Yes.

9        Q    Okay.

10       A    I think the U.S. Attorneys had him here; the

11   U.S. Attorneys had him here because of that.

12       Q    Because of what, the writ?

13       A    Yes.

14       Q    Uh-huh, okay, all right.  So it's a

15   difficult population, I take it?

16       A    Yes.

17       Q    Okay.  And were the inmates during that time

18   period held in single cells?

19       A    Yes.

20       Q    Okay.  And how long would they spend in

21   their cells per day?

22       A    Approximately 23 hours a day.

**Capital Reporting Company**

Page 10

1      Q      Okay.  And they would come out to what,

2   shower?

3      A      One hour for rec.

4      Q      One hour for shower, all right.  And would

5   they rec by themselves?

6      A      Yes.

7      Q      So single recreation?

8      A      Single recreation.

9      Q      So would they be allowed out onto the tier;

10   would that be what their recreation would consist of?

11      A      No, the rec area -- you have two cage areas

12   in South One; they rec inside the cage in South One.

13      Q      Okay, all right.  And can they take a shower

14   during the recreation period?

15      A      Yes.

16      Q      Okay, so they can take a shower.  Can they

17   make a call -- telephone call?

18      A      Yes.

19      Q      And is there a TV there in the rec room --

20   rec area?

21      A      I'm not sure.

22      Q      Okay.  And that would be -- that one-hour

**Capital Reporting Company**

Page 11

1    rec would be seven days a week?

2        A    I'm not sure.

3        Q    Of five days a week?

4        A    I'm not sure.

5        Q    Okay.

6        A    I'm not sure about the rec schedule.

7        Q    But you are sure that it wasn't seven days a

8    week?

9        A    Yes.

10       Q    Okay, all right.  During this time period

11   were you familiar with a Sergeant Melvin Reese?

12       A    He's one of my employees assigned to the

13   Housing Unit.

14       Q    Okay.  And he was assigned to South One?

15       A    South One.

16       Q    Okay.  Did you know at that time, September

17   2005, he had been convicted of criminal offenses?

18       A    No.

19       Q    Did you ever find that out?

20       A    No.

21       Q    So this is the first time you've heard that

22   -- today?

Page 12

1          A      Yes.

2          Q      Uh-huh.  Had you known at the time,

3    September 2005, that Sergeant Reese had been convicted

4    of two criminal offenses -- making threats -- would you

5    have had him assigned to South One?

6                MR. SCHIFFERLE:  Objection to form.

7    BY MR. ALLEN:

8          Q      Do you understand my question?

9          A      Yes, I understand your question.

10         Q      Yeah.

11         A      The question is kind of evasive.

12         Q      Well, let me see if I can -- I'm not trying

13    to trick you or anything.

14         A      Yeah.

15         Q      All right.  Is it appropriate to have as the

16    officer in charge of a unit like South One somebody who

17    has been convicted of criminal offenses involving

18    threats; in your opinion, is that an appropriate

19    assignment for such a person?

20                MR. SCHIFFERLE:  Same objection.  You can go

21         ahead and answer if you can.

22         A      Yeah, well, that's the policy of the

**Capital Reporting Company**

Page 13

1    Department of Corrections that we don't house any -- I

2    mean, that we don't assign any officers who have

3    criminal convictions.

4        Q    All right.

5        A    To any assignment.

6        Q    So he shouldn't have been assigned to that

7    unit then?

8        A    By the master roster that's his assigned

9    post.

10       Q    No, but --

11       A    We have a master roster file that says that

12   he bidded on the post.

13       Q    Well, I know he was assigned.

14       A    Right.

15       Q    Yeah, I mean, there's no question that he

16   was there. The question is with those criminal

17   convictions should he have

18   been there?

19            MR. SHIFFERLE:  Same objection.  Go ahead.

20       A    No.

21       Q    Why not?

22       A    I don't understand the question.  You're

**Capital Reporting Company**

Page 14

1    asking me if he had a conviction would he be on the

2    post.  If I had prior knowledge -- or if anyone had

3    prior knowledge -- he wouldn't be employed by DOC,

4    that's what I'm saying.

5         Q    Okay.

6         A    So -- when we go through the master roster

7    process, we will look at, you know, the staff -- do they

8    train on specialized fields or do they have anything

9    outstanding, and that's where we make our judgments.

10        Q    Okay.  Are correctional officers required to

11   fill out any information sheets prior to being

12   reassigned or assigned to a particular unit; in other

13   words, before someone gets assigned to a unit like South

14   One -- which you told me is a difficult unit -- are they

15   required to update the information that you have on

16   them?

17        A    Well, we have a notifications process.  We

18   also actually use a bid sheet to actually bid for his

19   qualifications for a post assignment.

20        Q    Okay.

21        A    But anything that happened prior to his

22   notification process, if he gets involved in any

**Capital Reporting Company**

Page 15

1   incidents, that information would become known; and,

2   again, we would have to make the appropriate changes to

3   the roster.

4       Q    Okay.  And had you known that he had these

5   criminal convictions at the time that he would not have

6   been assigned to South One is what you're saying?

7       A    Correct.

8       Q    All right.  Now, turning to the events of

9   September 27, 2005; first of all, let's get that one

10  marked.

11               (Waldren Deposition Exhibit No. 1 --

12               "Memorandum to Dennis Harrison

13               (Acting Warden) from Stanley Waldren

14               (Major of Operations) dated October

15               3, 2005" -- was marked for

16               identification.)

17         Is what's been marked as Deposition Exhibit

18  1 a memo that you prepared on October 3, 2005 and sent

19  to Dennis Harrison?

20      A    Yes.

21      Q    All right.  And I was trying to think, is

22  that your signature above Stanley M. Waldren?

**Capital Reporting Company**

Page 16

1        A      Yes.

2        Q      Okay.  Now, did you at any point on

3   September 27, 2005 actually yourself go to South One?

4        A      Yes.

5        Q      All right.  And what alerted you to the

6   situation there?

7        A      Captain Walter Coley gave me a telephone

8   call.

9        Q      Okay.  So you were sitting in an office?

10       A      Yes, I was sitting in the Warden's office in

11   a meeting.

12       Q      Okay, all right.  And did you immediately

13   respond to that telephone call by going to South One?

14       A      Yes, after he told me what was going on

15   inside the unit -- yes.

16       Q      Okay.  And what did he tell you was going on

17   inside the unit?

18       A      He said that the inmates in the unit was

19   rebelling, they were very disruptive, combative, and the

20   unit was flooded.

21       Q      Okay.  And if I can just direct your

22   attention to the bottom of the second paragraph there.

**Capital Reporting Company**

Page 17

1    It says, right at the bottom:  "Further, the inmates

2    were threatening to spray anyone who entered the tier

3    with the unknown substance."  Do you see that?

4        A    Yes.

5        Q    Okay.  So I take it that nothing had -- when

6    Coley called you, he was telling you that they were

7    threatening to do it but they hadn't done it yet?

8        A    No, they had done it.

9        Q    Okay.

10       A    It was done when I got there.

11       Q    All right.  So is this sentence -- what

12   Coley told you or not -- that they were threatening to

13   spray the unknown substance?

14       A    No, just prior to that.  You said it was

15   Captain Coley -- that the inmates on the upper-left tier

16   were hostile and flooding the tier; that's just prior to

17   the other sentence you read.

18       Q    Okay.

19       A    So when I responded to the unit, the unit

20   was already with feces and urine on the wall and

21   flooded.

22       Q    Okay, all right.  So I guess a fair reading

**Capital Reporting Company**

Page 18

1    of that is that Coley told you that some bottles filled

2    with an unknown substance reported to be feces had

3    already been used and they were threatening to do it

4    again?

5        A    Again, yes, sir.

6        Q    Okay, all right.  And how long did it take

7    you to get to the unit after you received the phone

8    call?

9        A    No more than about five minutes.

10        Q    Okay.  And what did you see when you first

11    arrived?

12        A    When I first approached the unit, I spoke to

13    Captain Coley.  I looked up at the upper-left tier;

14    there was feces and urine on the walls, the floors,

15    water flooding from the top tier down to the bottom

16    tier, and officers standing around by the entrance of

17    the tier, the left tier.

18        Q    How many officers were there?

19        A    I can not recall.

20        Q    All right, okay.  Do you know an officer

21    called Cuthbert Denton?

22        A    Yes.

**Capital Reporting Company**

Page 19

1      Q      Was he there?

2      A      I can not recall.

3      Q      Do you recall the names of any of the

4  officers who were there?

5      A      Yes.

6      Q      Who can you recall?

7      A      Lieutenant Buabeng, Sergeant Armstrong,

8  Officer Marshall Day, I think Paul Murray.

9      Q      Who is he, Paul Murray?

10     A      I think he was assigned to the cellblock in

11  South One.

12     Q      Okay, all right.  About how many officers

13  were in total were there, if you can recall?

14     A      I can not recall.

15     Q      Okay, all right.  What did you do?

16     A      I spoke to the lieutenant and he gave me an

17  assessment, and then I went and spoke to Captain Coley.

18     Q      So the lieutenant would be Buabeng?

19     A      Buabeng, yes.

20     Q      Okay.

21     A      And he was telling me what was going on, and

22  I spoke to Captain Coley.

**Capital Reporting Company**

Page 20

```
 1        Q      So you spoke to Buabeng, Captain Coley?

 2        A      Yes.

 3        Q      And who else, I think you mentioned someone

 4   else?

 5        A      Well, that's the only two I really talked

 6   to.

 7        Q      All right.  And what did Buabeng tell you?

 8        A      Well, he said the inmates were threatening

 9   that if anyone stepped on the tier, that they were going

10   to squirt feces and urine and unknown substances on

11   them.

12        Q      All right.  Now, did Buabeng at that point

13   -- did he have any, had he been squirted with anything,

14   did he have anything on his clothing?

15        A      I didn't see anything on his clothing.

16        Q      Okay, all right.

17        A      No.

18        Q      And you spoke to Captain Coley also?

19        A      Yes.

20        Q      And what did he tell you?

21        A      The same thing, that the unit was disruptive

22   and the officers were waiting for further directives.
```

Page 21

1      Q      Okay.  Did he appear to have been squirted

2    with anything, Captain Coley?

3      A      No.

4      Q      Okay, all right.  At that point did you see

5    any officers who appeared to have been squirted with

6    anything?

7      A      I can't recall.

8      Q      Uh-huh, all right.  So after you spoke to

9    Buabeng and Coley, what did you do next?

10     A      I stepped up to the tier and I spoke to the

11   inmates and the inmates told me the same thing:  the

12   first person who stepped on the tier they were going to

13   squirt feces and urine on them.

14     Q      Okay.  And what did you say to the inmates?

15     A      Well, I was trying to find out what was the

16   problem.

17     Q      Okay.

18     A      And they started hollering all kinds of

19   profanity, loud vocal, they became very boisterous in

20   their responses. There were mattresses in front of all

21   of their cell doors.

22     Q      Okay.  If I could just hold you on right

**Capital Reporting Company**

Page 22

1    there for a second.  All right, you said that you got

2    kind of an animated response in the unit?

3        A    Yes.

4        Q    All right.  Did you get any sense of what it

5    was all about, what had sparked this -- what had

6    precipitated this?

7        A    Not at that point.

8        Q    Okay.  You just heard a bunch of voices?

9        A    Yes, everybody on the tier was hollering.

10       Q    Okay, all right.  Were you actually on the

11   tier at the point where --

12       A    No, I was standing at the front of the tier.

13       Q    Okay.

14       A    In the doorway.

15       Q    Did anybody throw anything at you at that

16   point?

17       A    No.

18       Q    Okay.  And then -- okay, so you weren't

19   really able at that point, anyway, to get much of a

20   sense of what the problem was.  What did you say to

21   them?

22       A    Well, at that point, I stepped away and I

**Capital Reporting Company**

Page 23

1    called the Warden.

2        Q    All right.

3        A    And I told him what was going on inside the

4    unit.

5        Q    And that would be Dennis Harrison?

6        A    Yes.

7        Q    Okay.  And what did you tell him?

8        A    I told him what was going on inside the

9    unit, and he told me to address the problem.

10       Q    Okay.  Did he recommend any specific course

11   of action?

12       A    No.

13       Q    He just said deal with it, basically?

14       A    Right.

15       Q    All right, okay.  All right, so then what

16   did you do?

17       A    At that point I went back to the tier, I

18   kept giving verbal directives a number of times to the

19   inmates.

20       Q    And what, exactly, did you say to them?

21       A    Basically, I was telling them to step back

22   to their -- take their mattresses down, take the sheets

**Capital Reporting Company**

Page 24

1   and the shirts around their heads to no avail.

2        Q    So I take it some inmates had put mattresses

3   up against their cell doors, is that what you're saying?

4        A    Yes, a majority of the Housing Unit; a

5   majority of the cellblocks had mattresses in front of

6   their cell doors and they had sheets tied around their

7   heads -- towels.

8        Q    All right.  At that point could you smell

9   any mace on the unit?

10       A    No.

11       Q    Okay.  So you told them to take the

12  mattresses down?

13       A    Yes.

14       Q    All right.  And did that happen?

15       A    No.

16       Q    Did anybody take the mattresses down?

17       A    No.

18       Q    Did all the cells have mattresses in front

19  -- in the front gate?

20       A    Well, I couldn't see all of the cells;

21  majority of them that I'd seen on the left and the right

22  side had mattresses.

**Capital Reporting Company**

Page 25

1    Q    So all the ones that you could see had

2    mattresses, correct?

3    A    Yes.

4    Q    And that was, you say, on the right side?

5    A    Well, there's two sides to the tier.

6    Q    Right, no, I understand; I'm just trying to

7    get a sense of -- do you know which cell numbers those

8    would've been?

9    A    No.

10    Q    Okay.  Is that odd on the one side and even

11    on the other?

12    A    I know it's cell 20 on the right side.

13    Q    Okay.  So it was on the same -- you could

14    see on the same side as cell 20?

15    A    But I could also see the left side.

16    Q    Okay.

17    A    So both of them had mattresses up.

18    Q    All right.  And all the cells you could see,

19    you were at the end of the tier, correct?

20    A    I was at the beginning of the tier.

21    Q    Okay.  Close to cell 20?

22    A    Yes.

**Capital Reporting Company**

Page 26

1      Q     And you could -- how many cells could you

2   see, approximately?

3      A     May about 10 or 15.

4      Q     Okay.  Out of a total of how many?

5      A     I can't recall.

6      Q     Okay.  And of those 10-15 that you could

7   see, did they all have mattresses up at the gate?

8      A     Yes.

9      Q     All right.  And they all failed to comply

10  with your instructions to take the mattresses down?

11     A     Yes.

12     Q     All right, okay.  What did you do then?

13     A     I continued to give verbal commands for them

14  to take the mattresses down and the towels.  We had to

15  show force there.

16  You had the Lieutenant, the Captain, and myself as the

17  Major;

18  and they still would not comply with my directives.  So

19  inmates continued to make verbal threats to do bodily

20  harm to myself and to the staff; and, at that point, as

21  I walked down the tier, I saw the water and the feces

22  and the urine until I got to the rear of the cellblock.

**Capital Reporting Company**

Page 27

1          Q       Okay.  If I could just hold you there.  So,

2    basically, you repeat the instructions?

3          A       Yes.

4          Q       And you continue to get non-compliance?

5          A       Correct.

6          Q       All right.  So you then walk down the tier?

7          A       Giving the same directives, yes.

8          Q       Okay.  And did anybody throw substances at

9    you while you did that?

10         A       No.

11         Q       Okay, all right.  Was there any water on the

12   floor at that point?

13         A       Yes.

14         Q       Okay.  Had there been water on the floor

15   when you first arrived?

16         A       Yes.

17         Q       Okay.  Did you observe any objects on the

18   tier when you first arrived on the tier; did you see any

19   objects?

20         A       Feces and urine.

21         Q       All right.  Where did you see that?

22         A       Floating in the water.

**Capital Reporting Company**

Page 28

1     Q    Okay.

2     A    All on the walls along with food particles.

3     Q    All right, okay.  So you walk down the tier

4 and you basically repeat the instructions that you had

5 given previously?

6     A    Yes.

7     Q    Take down the mattresses?

8     A    Take down the mattresses and take the sheets

9 and towels, tell everybody to sit on their bunks.

10    Q    Okay.  And do what?

11    A    I just told them to sit if they wasn't

12 involved in the incident.

13    Q    Uh-huh, all right.  And so you go right away

14 down the tier at that point.  You can see all of the

15 cells at that point because you walk all the way down

16 the tier, correct?

17    A    I couldn't see the cells on the far end

18 because they're all the way down in the corner.

19    Q    Okay.  So there were --

20    A    I can see the majority of the cells.

21    Q    Okay.  So maybe a couple of cells that you

22 couldn't see?

**Capital Reporting Company**

Page 29

1       A       Correct.

2       Q       All right.  All the ones that you could see,

3    did they have mattresses up at the gate?

4       A       Majority of them, yes.

5       Q       All right, okay.  Do you know how many

6    didn't?

7       A       No.

8       Q       All right.  So what do you do then after

9    they -- and nobody complies, I take it, to your

10   instruction; nobody takes the mattresses down?

11      A       Correct.

12      Q       All right.  So what do you do then?

13      A       I walk all the way down, as I said myself

14   and Captain Coley, until I got all the way to the end; I

15   turned around and I talked to the inmate who was closest

16   to me in the cell.

17      Q       Who was -- do you know who that was?

18      A       No.

19      Q       Okay, all right.

20      A       I tried to ascertain what the problem was

21   and asked him was he going to be the spokesman for the

22   tier.

Page 30

1      Q      Uh-huh.

2      A      And at that time he said that -- I remember

3   him saying Sergeant Reese's name.

4      Q      Uh-huh, okay.  Do you remember anything else

5   about what he said?

6      A      No.

7      Q      So you asked him basically what the problem

8   was and he mentioned Sergeant Reese?

9      A      Yes.

10     Q      Okay.  But you have no recollection as to

11  any of the contacts of what Sergeant Reese was mentioned

12  in; you could not recall anything that he said about

13  Sergeant Reese?

14     A      Correct.

15     Q      And you don't remember the name of that

16  inmate?

17     A      No.  He was in the far cell all the way at

18  the end of the cellblock; I don't know his cell number.

19     Q      Okay.  Was it on the left-hand side or the

20  right-hand side?

21     A      Left-hand side.

22     Q      And the lock --

**Capital Reporting Company**

Page 31

1      A    Coming back up it would be the left-hand

2  side.

3      Q    You mean coming back --

4      A    Yeah, because -- as I told you -- I went all

5  the way down the tier.

6      Q    Yeah.

7      A    So going down the tier it's on my right-

8  hand side. So when you're going back up its --

9      Q    Okay, when you turn around it was on your

10  left?

11      A    Correct.

12      Q    Okay, all right.  Did that inmate have his

13  mattress on the gate?

14      A    Yes.

15      Q    Okay, all right.  So did you inquire further

16  as to what the problem with Reese was?

17      A    No.

18      Q    Okay.

19      A    Although at that point I thought that they

20  was ready to submit to a shakedown.

21      Q    So things were quiet at that point, or it

22  appeared to be?

**Capital Reporting Company**

Page 32

1      A      Well, they was still loud and using

2   profanity, but I was still conversing with that inmate,

3   and it seem like they was ready to comply.

4      Q      Okay.  Well, is there anything in particular

5   that gave you that impression?

6      A      Yes.  From what the inmate was saying to me

7   that they was going to comply with the shakedown.

8      Q      Oh, so he said that he was going to anyway?

9      A      No, he was saying that the cellblock; the

10  tier was going to comply with the shakedown.

11     Q      Okay.  So he told you the tier will submit

12  to being shaken down?

13     A      Correct.

14     Q      Okay.  And he also mentioned something about

15  Sergeant Reese?

16     A      Yes.

17     Q      Okay, all right.  So what did you do next?

18     A      Well, I gave him and my officers a directive

19  of how the cell shakedown was going to -- how we was

20  going to commence with the shakedown; so I said we was

21  going to start.  Prior to that I had already sent

22  Lieutenant Hendrix because the video camera wasn't

**Capital Reporting Company**

Page 33

1  working.  I had sent Lieutenant Hendrix to get a

2  handheld camera so we can document the shakedown and

3  have photos for the housing unit prior to commencing

4  with the shakedown.

5      Q    Okay, all right.  So when were you advised

6  that the video -- let's talk about that a little bit.

7  There's a video surveillance system that was supposed to

8  be in use on the unit on that day, correct?

9      A    Yes.

10     Q    All right.  And there were cameras on the

11 tier that we're talking about?

12     A    Yes.

13     Q    Which is the upper-left tier, correct?

14     A    Yes.

15     Q    All right.  And you were advised that the

16 cameras weren't working?

17     A    Yes.

18     Q    Who advised you of that?

19     A    Well, I made an inquiry about the cameras,

20 and that's why I sent Lieutenant Hendrix to get a video

21 camera; and then when he said that wasn't working, I

22 asked for a handheld camera.

**Capital Reporting Company**

Page 34

1      Q      Okay, I understand, but do you recall who

2    advised you, though, that the cameras in the unit

3    weren't working; do you recall who told you that?

4      A      No.

5      Q      Do you know how that was ascertained that

6    they weren't working; where did they go to check?

7      A      Well, they check right inside the Control

8    Module.

9      Q      Okay, so that's where you would go to check

10   to make sure it was working?

11     A      Yes.

12     Q      Okay.  And you sent someone there to make

13   sure that it was working?

14     A      Well, Lieutenant Hendrix is trained so

15   that's why I sent him to check, and he told me that it

16   wasn't working.

17     Q      All right.  So Hendrix was the one who went

18   to the Control Module to check on the video surveillance

19   system and determined that it wasn't working?

20     A      Yes.

21     Q      All right.  And you then said, okay, go get

22   a video camera?

Page 35

1    A    Yes.

2    Q    All right.  And you waited for him to return

3    with the video camera?

4    A    At that point he told me directly again that

5    that wasn't working, so that's when I sent him out to

6    get the handheld camera.

7    Q    Okay.  So I'm a little confused here; this

8    is probably my fault and not your fault, but the

9    surveillance cameras that were on the tier, Hendrix told

10   you they weren't working?

11   A    Correct.

12   Q    Okay.  And then you instructed Hendrix to go

13   an get a handheld video?

14   A    Yes.

15   Q    Okay, all right.  And then he told you that

16   the handheld video wasn't working?

17   A    Correct.

18   Q    Okay.  And then what did you do?

19   A    I told him to get an instamatic camera,

20   which he did; he came back with an instamatic camera.

21   Q    And that was all prior to starting any cell

22   extractions?

## Capital Reporting Company

Page 36

1      A     Yes.

2      Q     Had you had any reports of the surveillance

3   cameras in South One not working prior to this time?

4      A     I can not recall.

5      Q     You can't recall?

6      A     No.

7      Q     Okay.  If you had been notified, how would

8   you have been notified?

9      A     Well, several ways; it could've been

10  Lieutenant Hendrix, it could've been the Command Center,

11  it could've been the Zone Lieutenant.

12     Q     Are there any, or should there have been

13  any, checks of the camera system at the beginning of

14  each shift?

15     A     Yes.

16     Q     Okay.  So at the beginning of each shift,

17  the system is supposed to be checked to see whether it's

18  operational or not?

19     A     Yes.

20     Q     And do you know whether -- what shift are we

21  talking about here?

22     A     Number two shift.

**Capital Reporting Company**

Page 37

```
1        Q     Number two shift?

2        A     Yes.

3        Q     Okay.  Do you know whether there had been

4   any report of the camera system not working at the start

5   of the number two shift?

6        A     Not to my knowledge.

7        Q     Okay.  If the camera system had been checked

8   at the beginning of the number two shift, who would've

9   done that?

10       A     Well, it should've been the officer assigned

11  to the cellblock; they actually check the camera along

12  with the other equipment when they assume the duties on

13  their post.

14       Q     Okay.  But would it, in particular, be the

15  officer assigned to the bubble?

16       A     Yes.

17       Q     Okay.  And if he had discovered that the

18  system was not working, what should he had done?

19       A     Call the Command Center or the Zone

20  Lieutenant.

21       Q     Okay.  Should he also have made an entry in

22  the unit log book?
```

**Capital Reporting Company**

Page 38

1      A     Yes.

2      Q     All right.  Have you ever looked at the unit

3   log book for this particular day, September 27th, 2005?

4      A     Yes.

5      Q     You have?

6      A     Yes.

7      Q     When did you do that?

8      A     I think right after the incident.

9      Q     Okay.  Did you see any report of the camera

10   system not working in the unit log book?

11      A     I can not recall, it was like two years ago.

12      Q     Uh-huh, all right.  And with respect to the

13   unit log books, where are they kept after they're --

14   they're kept in sort of ledgers, correct?

15      A     Yes.

16      Q     Green -- usually green ledgers; and, after

17   they're full, where do they go?

18      A     Well, they're supposed to be turned in

19   either to the Command Center or the Litigation Officer

20   normally comes and gets them.

21      Q     Okay.

22      A     And give them a new book.

**Capital Reporting Company**

Page 39

```
 1        Q      So they're kept?

 2        A      Yes.

 3        Q      All right.  And do you know how long they're

 4   kept for?

 5        A      I don't know the retention.

 6        Q      Okay.  And there's a Litigation Office you

 7   say?

 8        A      Litigation Officer.

 9        Q      Oh, a Litigation Officer?

10        A      Yes.

11        Q      Okay.  Do you know who the Litigation

12   Officer was as of September or October of 2005?

13        A      I think it was Edgar McPhee.

14        Q      Edgar McPhee.

15        A      Yeah.

16        Q      Is he still with the Department?

17        A      No.

18        Q      All right.  Where is he now, do you know?

19        A      Retired.

20        Q      Okay.  Oh, McPhee, is it -- McPhee?

21        A      Yeah, McPhee.

22        Q      Okay, because I saw him this morning.
```

**Capital Reporting Company**

Page 40

```
1        A      No, that's Menefee that you saw this

2   morning.

3        Q      Menefee, okay.

4        A      Yeah.

5        Q      All right, okay.  Does McPhee do any part-

6   time work for the Department anymore or is he completely

7   retired?

8        A      No.

9        Q      He doesn't do anything?

10       A      No.

11       Q      Okay.  When was the last time you saw him?

12       A      I can't recall.  It think it was last year

13   when he retired.

14       Q      Okay.  And is there a Litigation Office

15   somewhere in the Jail?

16       A      Yes, it's there on the second floor.

17       Q      Okay.  And you say the unit log book would

18   either go to the Litigation Office or it would go to

19   some other place that I can't remember.

20       A      Well, they might turn it into the Command

21   Center and they would give them another book, but then

22   the Litigation Officer would retrieve that book from the
```

Page 41

1    Command Center.

2         Q     So either way it should end up in the

3    Litigation Office?

4         A     Yes.

5         Q     Okay, all right, good.  So after we've

6    gotten to the point where you have been told that the

7    video cameras weren't working -- that the surveillance

8    cameras weren't working and the video cameras weren't

9    working -- and the still camera had arrived, okay; what

10   did you do at that point?

11        A     Well, the officers already got directed to

12   start with the first cell on the tier to start the

13   shakedown to try and take the contraband, plastic

14   containers outside of each cell.  And at that point the

15   inmate in the first cell got very aggressive and

16   combative and --

17        Q     Who was that inmate, do you know?

18        A     No.

19        Q     Was it --

20        A     I think the first cell on that tier is 20

21   cell.

22        Q     20 cell, okay.  Anyway, the occupant of what

Page 42

1   you think may be 20 cell became very combative, if I

2   recall you correctly?

3       A    Yes.

4       Q    Okay.  What did he do in particular?

5       A    He retreated to the back of his cell still

6   and threatening comments, threatening staff to do bodily

7   harm, had feces and urine and threatened to squirt it on

8   staff.  He still had the mattress in front of the cell

9   door.  So when the staff had the door opened to do the

10  shakedown, all of the other inmates on the tier started

11  squirting feces --

12      Q    All of them?

13      A    Yes.

14      Q    So every cell started squirting feces and --

15      A    Hollering loud, throwing stuff out of their

16  cells at that point.

17      Q    Okay, all right.  I just want to be clear

18  about this.  As the officers went into 20 cell, okay,

19  where were you at that point?

20      A    I was still at the rear of the dormitory.

21      Q    Okay, the tier, you mean?

22      A    Yes.

**Capital Reporting Company**

Page 43

1      Q    Uh-huh, all right.  And as the officers went

2    into 20 cell, you're saying that all of the other cells

3    started throwing objects and squirting fluids from their

4    cells?

5      A    Yes.

6      Q    Okay, all right.  How many officers went

7    into 20 cell?

8      A    I can not recall.

9      Q    Okay.  Could you see -- yes, sorry.  Could

10   you see what happened inside the cell when they went in?

11     A    No, I was still in the rear of the cellblock

12   at that time -- at the rear of the tier?

13     Q    All right.  How long were they in there

14   before they came out?

15     A    Well, at that point, Sergeant Simpson was

16   down in the tier with me and he was trying to work his

17   way back up to the tier, and the inmates was squirting

18   feces and urine all over him while he was trying to work

19   his way back up to the tier.

20     Q    Uh-hum, okay.  How long before -- did the

21   officers eventually extract the occupant of 20 cell?

22     A    Yes.

**Capital Reporting Company**

Page 44

1       Q      All right.  And how long did that take?

2       A      A matter of seconds.  Then went in and put

3   restraints and brought him out.

4       Q      Okay.  So when he came out he was already

5   restrained?

6       A      I can't recall.

7       Q      Was he fighting?

8       A      Yes, he was fighting, yes.

9       Q      He was still struggling?

10      A      As we went in each cell, all inmates were

11  fighting.

12      Q      Okay.  Well, I thought you had -- and

13  correct me if I'm just misunderstanding what you told me

14  -- I thought you had told me that you couldn't see what

15  happened inside 20 cell when the officers went inside

16  from where you were?

17      A      That's correct, you can't see inside the

18  cell, but you can hear the inmate and I heard his

19  statements and --

20      Q      Okay.  And what did he say?

21      A      Come on in and call out your name.  He was

22  being very disrespectful and threatened to do bodily

**Capital Reporting Company**

Page 45

1    harm.

2         Q      All right.  But you were unable to see what

3    actually physically happened inside the cell?

4         A      Correct.

5         Q      Okay.  But when you saw the inmate being

6    removed from the cell, 3-4 seconds later, he appeared to

7    be struggling?

8              MR. SCHIFFERLE:  Objection to form.  Go

9         ahead.

10   BY MR. ALLEN:

11        Q      Was he struggling at that point?

12        A      Yes.

13        Q      All right.  Can you describe how he was

14   struggling?

15        A      Kicking, spitting.

16        Q      Okay.  And I think I've asked you this

17   before -- and I don't mean to be repetitive, but I'm

18   just not quite sure -- are you saying that at that point

19   as he's coming out now he's kicking and spitting, is he

20   doing anything with his fists or not?

21        A      He had been aggressive so I can't recall

22   whether he had restraints, because some inmates we pop

**Capital Reporting Company**

Page 46

1  their cell and they start running towards the officer.

2      Q    Okay, all right.  Do you recall whether

3  that's what happened in this particular incident or not?

4      A    I can't recall.

5      Q    So what happened with the occupant of 20

6  cell after he was extracted from the cell?

7      A    Well, they had to be escorted.  A chemical

8  agent was used and I'm not sure if it was used in that

9  cell, but they have to be escorted to the infirmary for

10  medical treatment according to policy.

11      Q    Okay, all right.  Do you know whether the

12  chemical agent was used for 20 cell?

13      A    I'm not sure, I can't recall.

14      Q    All right.  Would that have been standard

15  procedure after he'd refused to comply with the request

16  to take down the mattress and sit on his bed.  If he had

17  been non-compliant, then those requests would've been

18  standard procedure to use a chemical agent at that

19  point?

20      A    Yes.

21      Q    Okay.

22      A    But even with a chemical agent an inmate

**Capital Reporting Company**

Page 47

1    still may be aggressive; they just don't stop because

2    you spray a chemical agent.

3         Q    Okay.  After he was extracted from the cell

4    -- and we're still on 20 cell -- what did you see with

5    reference to him after that time.  Did the officers

6    continue to try and subdue him?

7         A    Well, I know the inmate was still

8    struggling.

9         Q    Okay.  And was he restrained?

10        A    I can't recall.

11        Q    Did you see anybody punch him?

12        A    I can't recall.

13        Q    Did you see anybody kick him?

14        A    I can't recall.  No, I didn't see no one

15   kick anybody, no.

16        Q    Okay.  Did you see anything, which in your

17   opinion, may have caused injury to the occupant of 20

18   cell after he was taken out of the cell?

19        A    Basically, what I had seen when the inmate

20   came out of his cell was the least amount of force that

21   the correctional officer had to use to gain control of

22   the force used by that inmate.

**Capital Reporting Company**

Page 48

1      Q      Okay.  But with that, given what you see in

2   your opinion, would that have caused for injury to that

3   inmate?

4      A      No.  I can't say that.

5      Q      You don't know one way or the other?

6      A      Correct.

7      Q      Okay.  Well, can you give me any description

8   of what you actually observed?

9      A      Yes, I've seen my staff getting feces --

10     Q      No, no, no, I understand --

11     A      I've seen them getting assaulted inside the

12  cellblock; I can say that.  At that point, when the

13  inmate came out of 20 cell and for every inmate on that

14  tier, I've seen that.

15     Q      Okay, all right.

16     A      I can speak to that.

17     Q      Well, we're talking about 20 cell right now.

18     A      Well, I'm saying that -- but that

19  precipitated 20 cell, I told you that I've seen my staff

20  coming down the tier, getting feces and urine and items

21  thrown at them too; so it wasn't just at 20 cell.

22     Q      No, I know, but that's just what I'm

**Capital Reporting Company**

Page 49

1    focusing on for right now.

2        A    Okay.

3        Q    Okay, all right.  And the question is,

4    simply, can you remember what you observed happening,

5    how the officers attempted to restrain the inmate whom

6    you have said was still fighting?

7        A    Right.

8        Q    Okay.  And can you --

9        A    Well, if you actually asked me if he had

10   restraints on, I can not recall; but I do remember him

11   as being combative.

12       Q    Okay.  And can you describe anything that

13   the officers did?

14       A    No.

15       Q    Okay, all right.  What happened next?

16       A    Okay, at that point, the inmate was escorted

17   to the infirmary and he was given medical treatment.

18       Q    Okay.  I think I need -- all right, the

19   occupant of 20 cell is out, right, at this point and I

20   take it that other inmates were extracted?

21       A    Yes, they went cell to cell to shakedown.

22       Q    All right.  And did they extract all of the

Page 50

1    inmates from their cells?

2        A      No, as I walking down the tier, I gave a

3    verbal directive to any inmate that was not involved to

4    sit down on their bunk.  Some inmates complied, others

5    didn't, they kept squirting feces, being very aggressive

6    and combative towards staff.

7        Q      Okay.  So did this happen after the occupant

8    of 20 cell was out?

9        A      Yes.

10        Q      All right.

11        A      Well, they was squirting all the time,

12    before they took 20 cell out, I said that earlier.  They

13    were squirting before they took 20 cell out, because I

14    thought 20 cell would be complying with the shakedown

15    and he did; he retreated to the back of his cell.

16        Q      Right.

17        A      And at that point all resident inmates on

18    that tier -- majority of them -- started squirting feces

19    and throwing stuff at my staff.

20        Q      All right.  And then after that you repeated

21    your instructions for some of them to surrender?

22        A      Yes, there were non-compliant for them to

**Capital Reporting Company**

Page 51

1    sit on their bunk, but some did.

2        Q      Okay.  How many did?

3        A      I can't recall the number; it wasn't that

4    many.

5        Q      Okay.  So then, following that, all of the

6    non-compliant inmates were extracted from --

7        A      They went cell by cell; and, to prevent

8    injury to my staff and to the inmate, a chemical agent

9    was used to kind of quell the situation.

10       Q      Any --

11       A      I even had to use a chemical agent.

12       Q      Okay.  So in each case where the inmate

13   refused to come out of the cell, a chemical agent was

14   used?

15       A      No, not every case.  Some cases they popped

16   the door and went in.

17       Q      No, I said that in each --

18              MR. SCHIFFERLE:  Could you let him finish

19       the answer?

20              MR. ALLEN:  Yeah, I will.

21              MR. SCHIFFERLE:  Okay.

22   BY MR. ALLEN:

**Capital Reporting Company**

Page 52

1       Q       Go ahead.  The question is for the non-

2    compliant -- I'm not talking about the ones who

3    surrendered, okay?

4       A       Yes.

5       Q       I'm talking about the ones who didn't

6    surrender. Were they all subjected to a chemical agent?

7       A       The non-compliants?

8       Q       Yes.

9       A       If they were in the immediate area, they

10   probably got saturated with it from the smell, but they

11   got treated also.

12      Q       Okay.

13      A       So there wasn't no chemical agent used on

14   them, no.

15      Q       Sorry?

16      A       You said non-compliants?

17      Q       Right.  The ones who did not come out -- who

18   did not surrender -- who continued to have the

19   mattresses up and refused to sit on their bunks, as per

20   your instructions, were they maced; that's the question?

21      A       No.

22      Q       They weren't?

**Capital Reporting Company**

Page 53

1       A       Not all of them, no.

2       Q       Okay.

3       A       Some of them we just went in the cell and

4    put restraints on them and they brought them out, but

5    not everybody on that tier was maced, no.

6       Q       Okay.  How many inmates were maced?

7       A       I can't tell you, that's two years ago; no,

8    I can not recall.

9       Q       Do you have any idea?

10      A       No, sir.

11      Q       And now the person -- there was an

12   operational still camera on the tier while these cell

13   extractions were taking place, correct?

14      A       Well, I was looking at what was going on

15   with the incident so I couldn't see where Lieutenant

16   Hendrix was at, at the time, but he was given a

17   directive to take photos of the incident.

18      Q       Okay.

19      A       And that directive came from me.

20      Q       All right.  So as the inmates were removed

21   from their cells, the individuals who had been subjected

22   to a chemical agent were taken to the showers, is that

**Capital Reporting Company**

Page 54

1    where they were taken?

2          A     No, I told one of the lieutenants to make

3    sure that each of them make it up to the infirmary for

4    medical attention.

5          Q     Is this just the inmates who were maced or

6    everybody?

7          A     Inmates that was maced we treated them

8    first.

9          Q     Uh-huh.

10         A     Then Dr. Malakghasemi, the medical doctor,

11   was summoned down to the cellblock to see if anybody

12   else needed medical attention.

13         Q     Okay, all right.  Now, was a water hose ever

14   used at any point during this incident by correctional

15   officers?

16         A     Yes.

17         Q     Okay.  And when did that happen?

18         A     At the point you have feces and urine and

19   food substances all on the wall.  You have feces on

20   staff, trying to get some of the feces off the staff,

21   and then try to move the mattress from their front door

22   -- their cell doors.

**Capital Reporting Company**

Page 55

1    Q    So this was before the extractions began, or

2   not?

3    A    I can't recall.

4    Q    And who gave the order for the -- now, what

5   kind of water hose are we talking about here; can you

6   describe?

7    A    It's just a regular water hose that we use

8   in the unit in case when you have fires and different

9   things --

10    Q    Is it high-pressure, low-pressure or --

11    A    I'm not sure.

12    Q    Does it connect to a faucet or a fire

13   hydrant, or what is it connected to, do you know?

14    A    I'm not sure.  I don't think -- I'm not

15   sure.

16    Q    Okay, all right.  Who gave the instruction

17   to use the water hose?

18    A    I can't recall.

19    Q    Well, you were the officer in charge there;

20   you were the senior officer there, correct?

21    A    Yes.

22    Q    Were you there before the water hose was

**Capital Reporting Company**

Page 56

1    used?

2         A    Yes.

3         Q    Okay.  Did you order the water hose to be

4    used?

5         A    No.

6         Q    Do you know who did order the water hose?

7         A    No.

8         Q    And exactly at what point in the sequence of

9    events -- like, you told me you went onto the tier, and

10   you instructed them to surrender.  They didn't comply

11   and then later on cell extractions began involving the

12   use of some chemical agents.  I understand that.  Where

13   does the water hose fit into that sequence; is it after

14   you had given your instructions and before the cell

15   extractions, or after the cell extractions -- when did

16   that happen?

17        A    I'm not sure at what point; but, like I

18   said, I know a water hose was used and I know it was

19   used to get some of the feces because staff were walking

20   in feces and urine and the area was an environmental

21   safety for even being there.

22        Q    Okay.  Were the inmates themselves squirted

**Capital Reporting Company**

Page 57

1    with water?

2         A     Well, as I said, when they had their

3    mattresses in front of the cell door, just to get the

4    mattresses down -- yes.

5         Q     All right.  So water was squirted into

6    individual cells?

7         A     I didn't see that.

8         Q     What did you see?

9         A     I said with the mattresses in front of the

10   cell doors, they squirted the hose to get the mattresses

11   down and then staff went into the cell.  Maybe I seen it

12   on one cell.

13        Q     You just saw it on one cell?

14        A     Yes.

15        Q     Okay.  Do you remember which cell that was?

16        A     No.

17        Q     And so how long was the water hose used for?

18        A     I can't recall.

19        Q     Do you know who was operating the water

20   hose?

21        A     No, sir.

22        Q     Did you personally observe any officers

**Capital Reporting Company**

Page 58

1   being struck either with a fist or with a kick at any

2   point during this incident?

3        A    Yes.

4        Q    Okay.  What did you see?

5        A    Quite a few of my officers, when the inmates

6   were rebelling not to come out of their cells, every

7   inmate that was basically rebelling to come outside of

8   their cell were very aggressive and assaulted my staff.

9        Q    Which staff got assaulted, do you remember?

10       A    Excuse me?

11       Q    Do you remember any specific names of

12  officers who got assaulted?

13       A    No.

14       Q    Okay.  Do you remember the names of any

15  specific inmates who were assaulting?

16       A    No.

17       Q    Did you see any inmate ever being struck by

18  a correctional officer at any point during this

19  incident?

20       A    As I stated earlier, during the cell

21  extraction, I seen staff using the least amount of force

22  of the kind of force used on the inmate to get the

**Capital Reporting Company**

Page 59

1    inmate out of the cell.

2         Q      Yeah, I understand what you're saying, but

3    I'm asking you -- let me ask you a more specific

4    question.  Did you ever see any correctional officer

5    punch any inmate during this entire incident?

6         A      No.

7         Q      Sorry?

8         A      No.

9         Q      Okay.  Did you see any correctional officer

10   kick any inmate during this entire incident?

11        A      No.

12        Q      Did you see any correctional officer throw

13   any inmate to the ground during this entire incident?

14        A      It sounds like you're asking the same

15   question.  I still say I seen my officers use the

16   minimal amount of force, so I don't know how that man

17   got down on the ground; but to get the restraints on

18   these inmates --

19        Q      Okay.  So you saw some inmates being

20   wrestled to the ground, I take it?

21        A      Yes.

22        Q      Okay.  How many?

**Capital Reporting Company**

Page 60

1        A      I can't recall.

2        Q      Okay.  Do you recall the names of any of the

3   inmates who were wrestled to the ground?

4        A      Sir, this happened two years ago; I can't

5   remember the names of the inmates.

6        Q      All right.  Now, was it the policy of the

7   Department of Corrections to take photographs of inmate

8   injuries that may have been caused in an incident like

9   this; was that the policy that was in effect as of

10  September 27th, 2005?

11       A      I can't recall.  I know a policy came out

12  afterwards from the -- the Operations memo came out

13  after that incident.

14       Q      Right.

15       A      But it's a normal good correctional practice

16  that you would take pictures.

17       Q      Okay.  Had that been done to your knowledge

18  previously in other instances?

19       A      Yes.

20       Q      Okay, all right.  Now, as we talked, you

21  determined that the surveillance camera system was not

22  working during the incident.  Did you take any steps

**Capital Reporting Company**

Page 61

1    afterwards to determine what the problem was?

2         A    Yes.

3         Q    What did you do?

4         A    Myself, the Warden was notified and we

5    called the vendor -- the vendor who installed the system

6    inside the jail -- to try to ascertain what the problem

7    was.

8         Q    Okay.  When was that done?

9         A    I can't recall the date.

10        Q    Do you see what's been marked as Deposition

11   Exhibit No. 2?

12                        (Waldren Deposition Exhibit No. 2 --

13                        "Email from Stanley Waldren (DOC)

14                        to Elwood York (DOC) dated October

15                        8, 2005" -- was marked for

16                        identification.)

17        A    Yes.

18        Q    It appears to be -- is it a memo or an

19   email?

20        A    I'd say email.

21        Q    Oh, it's an email, but it's from you to

22   Elwood York, correct?

**Capital Reporting Company**

Page 62

1      A     Yes.

2      Q     And who was Elwood York at that time?

3      A     He was the Interim Director.

4      Q     Of the whole Department of Corrections?

5      A     Yes.

6      Q     All right.  And the date is Saturday,

7    October 8, 2005, correct?

8      A     Yes.

9      Q     All right.  Okay, now, if you can look down

10   to the sentence which starts with the word

11   "Additionally"; it says, "Additionally, Warden Harrison,

12   Lieutenant Hendrix and I met with Terry Johng, from

13   Pentabridges Corporation regarding the Surveillance

14   Cameras in South One."  When was that meeting?

15     A     Well, we met but I can't remember the actual

16   date.

17     Q     Uh-huh.  Well, the memo was October 8th,

18   2005.

19     A     Yes.

20     Q     So would it have been close to that date?

21     A     Yes, sir.

22     Q     Okay.  So either that day or the previous

Page 63

1    day, probably, or you can't recall?

2         A    I can't recall.

3         Q    Okay.  Would you have made any notes of that

4    meeting?

5         A    Besides the email, like I said, I think the

6    Warden and myself we came in one day and Lieutenant

7    Hendrix was supposed to have met with Mr. Johng to see

8    what the condition of the camera in South One was.

9         Q    Okay, all right.  Do you recall any of the

10   details of that meeting with Mr. Johng?

11        A    No.

12        Q    All right.

13        A    I think he gave all the information to

14   Lieutenant Hendrix.

15        Q    Okay.  Let's get this marked as Deposition

16   Exhibit No. 3.  Do you see what's been marked as

17   Deposition Exhibit No. 3?

18                  (Waldren Deposition Exhibit No. 3 --

19                  "Email from Terri Johng (Pentabridges)

20                  to Dennis Harrison (DOC) dated October

21                  12, 2005" -- was marked for

22                  identification.)

Page 64

1      A      Yes.

2      Q      And did you receive a copy of this?

3      A      Yes.

4      Q      Okay.  And this was sent to you by Terri

5  Johng?

6      A      Yes.

7      Q      Okay, and it explained what the problem was

8  or what he thought the problem was with the system?

9      A      Yes.

10     Q      Okay.  Looking at Deposition Exhibit No. 3,

11  just at the first couple of lines there, he says, "I

12  finally got the ok from Ajay Kapoor on the below

13  attached write-up.  Ajay wanted to make certain that I

14  include everything that will help the department.  So,

15  here it is."  Do you know what was meant by that,

16  "everything that will help the department"?

17     A      No.

18     Q      Okay.  Were you aware of press coverage of

19  this incident shortly after the incident occurred?

20     A      No.

21     Q      Okay.  Were you aware of a U.S. Attorney's

22  investigation into what happened on South One during

**Capital Reporting Company**

Page 65

1    this incident?

2        A      Yes.

3        Q      Okay.  When did you become aware of that?

4        A      Well, I know it was turned over to Internal

5    Affairs, which is the Department of Correction's

6    Internal Affairs.  Going to different hearings, I heard

7    it, you know.

8        Q      Okay.  So you went to some hearings?

9        A      Yes.

10       Q      Which hearings did you go to?

11       A      The ones the Department had.

12       Q      Okay.  When did you go to those hearings?

13       A      I can't recall the date.

14       Q      Do you know who was at the hearings?

15       A      Yes, you know, you have the executive staff,

16   Interim Director and his senior executive staff.

17       Q      So that would have been Dennis Harrison?

18       A      Yes.

19       Q      And what other senior staff were present?

20       A      You have myself, you have the Deputy Warden

21   of Operations; at that time it was Hulon Willis.  You

22   had a Deputy Director, Patricia Britton.

**Capital Reporting Company**

Page 66

1       Q       Okay.  And where did those hearings take

2   place?

3       A       Oh, downtown at the John Wilson Building.

4       Q       Okay.  Was this council hearings?

5       A       Yes, council hearings.

6       Q       Did you testify at council hearings?

7       A       No.

8       Q       Okay.  Do you know who did testify at the

9   council hearings?

10      A       Yes, the Interim Director.

11      Q       Okay.  Was he the only person who testified?

12      A       Mostly him or the Deputy Director but mostly

13  it would be the Interim Director, Elwood York.

14      Q       Okay.  Did you testify at any hearings?

15      A       No.

16      Q       Okay, all right.  Now, did Mr. Johng advise

17  you that the problem was a virus with the CPU unit that

18  was on South One?

19      A       Yes.

20      Q       Okay.  Was that the first time you had ever

21  been advised of a virus problem?

22      A       For that particular unit?

**Capital Reporting Company**

Page 67

1       Q      Yes.

2       A      Yes.

3       Q      Okay.  Had there been virus problems for

4    other computers on other units prior to that time?

5       A      Not to my knowledge.

6       Q      So this was the very first time that there

7    had ever been a problem with a virus on a computer that

8    was operating a surveillance system?

9       A      Well, I'm not a technology person so I'm not

10   the person to ask on that.

11      Q      Well, I'm not asking for, you know, a

12   technical analysis.

13      A      Right.

14      Q      I'm just asking whether that was the first

15   time you had ever heard of this problem?

16      A      In South One, yes; but, if you're asking

17   throughout the jail, I can not answer that.

18      Q      All right.  If you know, did Mr. Johng's

19   company conduct period maintenance on the surveillance

20   camera system; I mean, would they come by every so

21   often, like every week or every month or whatever.  Do

22   you understand my question?

**Capital Reporting Company**

Page 68

1      A      You're asking me a question; but, really,

2    that's my area.

3      Q      Oh, okay, you don't know.

4      A      I don't feel comfortable answering that.

5      Q      Oh, okay.  If you don't know, you don't

6    know.  Did you produce any other reports apart from the

7    reports that we've gone over here today?

8      A      There was another memo I wrote.

9      Q      Okay.  Did you bring it with you?

10     A      No.

11     Q      All right.

12            MR. SCHIFFERLE:  I thought I had it.

13            MR. ALLEN:  All right.

14            MR. SCHIFFERLE:  I have it.

15            MR. ALLEN:  Okay, thanks.  Can I get this

16     one marked or is this your only copy?

17            MR. SCHIFFERLE:  Well, you can mark it,

18     that's fine.

19            MR. ALLEN:  All right.  Or maybe we can get

20     a copy later.

21            MR. SCHIFFERLE:  Yeah, I'll see if I can get

22     a copy later.

**Capital Reporting Company**

Page 69

1          MR. ALLEN:  Let's get this marked, then.

2                    (Waldren Deposition Exhibit No. 4 --

3                    "Memorandum to Dennis Harrison

4                    (Acting Warden) from Stanley Waldren

5                    (Major) dated September 27, 2005" --

6                    was marked for identification.)

7    BY MR. ALLEN:

8          Q     What time have we got here?

9          A     About 1:20.

10         Q     It's not going to be too much longer.  Why

11   don't you read it and then if you could give it back to

12   me because we only have one copy.  Is that a memorandum

13   that you prepared?

14         A     Yes.

15         Q     Okay.  Was that prepared before or after the

16   other memorandum?

17         A     Before.

18         Q     Okay.  If you can remember, what was the

19   time gap between the two reports; did you do them one

20   after the other?

21         A     Well, this memo actually was done on the

22   date of the incident, which is dated September 27th,

**Capital Reporting Company**

Page 70

1    2005, which was an Informative Report submitted by me.

2         Q    Right, okay.

3         A    And once the incident occurred the entire

4    package come from the Shift Office to the Major Office

5    and I was the Major at that time, and what you have here

6    is the cover memorandum.

7         Q    Right, which the date on that is?

8         A    October the 3rd.

9         Q    Okay.  So you did that one first?

10        A    I did this one on the actual date, September

11   27th.

12        Q    Okay.

13        A    As an Informative Report.

14        Q    All right.  Now, on the Informative Report

15   it indicates that you actually used a chemical agent, is

16   that correct?

17        A    Yes.

18        Q    All right.  And you used that, it says in

19   that memo, on a resident called Morrow, Miquel Morrow?

20        A    Yes.

21        Q    Okay.  And were you the first person to use

22   a chemical agent?

**Capital Reporting Company**

Page 71

1        A     No.

2        Q     No, okay.  So other people had had chemical

3   agents used prior to you using the chemical agent on

4   Morrow?

5        A     Yes.

6        Q     Okay.  And did you also use the chemical

7   agent on Inmate Pleasant?

8        A     Yes.

9        Q     Okay.  And, again, was that the first use of

10  a chemical agent?

11       A     No.

12       Q     Okay, all right.  Did you participate in the

13  extractions of Morrow or Pleasant from the cells?

14       A     I can't recall but I know I used a chemical

15  agent to quell the situation.

16       Q     Okay.  You can recall using the chemical

17  agent but you can't recall whether or not you actually

18  extracted them from the cells?

19       A     Yes.

20       Q     Okay, all right.  Can you recall any other

21  details -- well, let's talk about Morrow first.  Can you

22  recall any of the details of his cell extraction, the

**Capital Reporting Company**

Page 72

1    extent to which he fought; did you witness any of that

2    or can you recall?

3        A    No, like I said, I witnessed them being very

4    combative and throwing and squirting feces and stuff and

5    being non-compliant to verbal directive towards our

6    staff.

7        Q    Okay.  Well, did you see Morrow try and kick

8    him?

9        A    We're talking about two years ago.

10       Q    Well, if you can't, you can't.

11       A    But any time -- I can't say that; any time

12   that someone used a chemical agent in this incident, the

13   inmate was non-compliant.

14       Q    Okay.  So do I take it then that the answer

15   to the question is you can't recall whether Morrow

16   kicked him?

17       A    Well, a chemical agent was use on him; he

18   must have kicked him.  He was very combative towards our

19   staff.

20       Q    Okay.  So, now the chemical agent would be

21   used while the officers were outside the cell, correct;

22   they would squirt it into the cell, is that when it

**Capital Reporting Company**

Page 73

1    would be used, how it would be used?

2        A    Say that again?

3        Q    When they're using the chemical agent, are

4    the officers outside the cell or inside the cell?

5        A    Well, it could be used several ways.  If the

6    cell door had the mattress in front of it and the inmate

7    had their face covered up, sometimes you might not be

8    able to get them from outside the door; so you may have

9    to pop the cell to go in to get the contrabands.

10        Q    Okay.

11        A    So you might have used it to gain control

12    once you got inside the cell.

13        Q    Can you recall what the situation was with

14    respect to Morrow?

15        A    No, sir.

16        Q    Okay, all right.  Did you see Morrow try and

17    punch anyone?

18        A    It was two years ago, sir.  Like I said, if

19    a chemical agent was used on him, he was being combative

20    towards our staff.

21        Q    Did you see anybody punch him, any

22    correctional officer punch Morrow?

Page 74

1        A      It's the same question.

2        Q      All right.  Did you see anybody kick him --

3    no, or you can't recall?

4        A      It's the same question; the inmate is being

5    uncooperative, so I can not say yes or no.

6        Q      All right.  Would those answers also apply

7    to Inmate Pleasant, that you can't recall whether you

8    saw him kick anybody?

9        A      That's it, sir, the whole tier was in a

10   total disarray and the inmates was throwing --

11       Q      I know, I know that, you said that a number

12   of times.

13       A      Okay.

14       Q      I'm not trying to trick you or anything; I'm

15   just asking you whether you had specific recollections

16   with respect to Inmate Pleasant?

17       A      No.

18       Q      So you can't say whether you saw him kick

19   anybody?

20       A      No, I can't say I didn't see him kick

21   anybody.

22       Q      No, that's fine -- that's fair enough.  Did

**Capital Reporting Company**

Page 75

1    you see him punch anybody?

2        A    It's still all the same question.  I can not

3    recall whether I'd seen him, but I know that a chemical

4    agent was used on him because he was being non-

5    compliant to a verbal directive.

6        Q    Okay, I'm not trying to sort of, you know --

7        A    You keep asking the same question.

8        Q    Well, because I want to get specific

9    information; if you don't have it --

10       A    Because this is two years ago.  I can not

11   sit here and tell you what inmate kicked staff or what

12   staff kicked an inmate; I can not tell you that.

13       Q    Okay.  Now, apart from that memo that we've

14   just been looking at and the other memo -- the one that

15   was done on October 3rd, I think you told me -- did you

16   do any other memos about this incident?

17       A    No.

18       Q    Okay.  Did you do any other written notes?

19       A    No, except -- like I said -- the email.

20       Q    The email.

21       A    Yes.

22       Q    Yeah, okay.  Have we looked at everything

**Capital Reporting Company**

Page 76

1     that you believe you generated in connection with this

2     incident?

3          A     Yes.

4          Q     Okay.

5                MR. SCHIFFERLE:  It is part of the package.

6                MR. ALLEN:  Yeah, sure.

7                MR. SCHIFFERLE:  It is part of the package

8          that was previously provided; I think there was

9          some other --

10               THE WITNESS:  The Disciplinary Report.  I

11         did write a DR on both inmates, a disciplinary

12         report on both inmates.

13               MR. SCHIFFERLE:  Okay.

14               MR. ALLEN:  On Morrow and Pleasant?

15               THE WITNESS:  Yes, for their aggressive

16         behavior, yes.

17               MR. ALLEN:  Okay.

18               MR. SCHIFFERLE:  Would you like to see

19         those?

20               MR. ALLEN:  No, I have seen them.

21     BY MR. ALLEN:

22         Q     But apart from that is there anything else

Page 77

1    you generated?

2         A      Not that I can recall.

3         Q      Okay, all right.  After this incident was

4    over, did you take any further steps to find out what

5    the problem with Sergeant Melvin Reese was?

6         A      When I left the unit after it seemed like it

7    was under control, I left the unit and left Captain

8    Coley to ensure that all inmates got to the infirmary

9    and I left the investigation to Internal Affairs.

10        Q      So you didn't make any further inquiries?

11        A      No.

12        Q      Okay.  Did you ever find out from any other

13   source what the problem with Sergeant Reese had been?

14        A      I can't recall.

15        Q      All right.  Prior to this incident had you

16   received any complaints about Sergeant Reese's behavior

17   on South One?

18        A      No.

19        Q      Prior to this incident were you aware of

20   Sergeant's Reese using mace much more frequently than

21   any other correctional officer at D.C. Jail?

22        A      Well --

**Capital Reporting Company**

Page 78

1          MR. SCHIFFERLE:  Objection to form.  Go

2      ahead.

3      A     Well, like I said, I think his mace was

4  taken from him a couple of times; I can't recall exactly

5  how many.

6      Q     Okay.  Do you know why that was done?

7      A     Yes, I think the Major at that time prior to

8  me took the mace because of excessive use.

9      Q     Okay.

10      A     But after the investigation they gave him

11  the mace back; there was nothing found.

12      Q     Okay.  As of September 27th, 2005, do you

13  know how long Reese had been assigned to South One?

14      A     No.

15      Q     Do you recall ever hearing any complaints

16  about Sergeant Reese conducting unnecessary strip

17  searches of inmates?

18      A     No, sir.

19      Q     Do you recall ever seeing any complaints

20  about Sergeant Reese for withholding supplies like

21  toilet paper from inmates on South One?

22      A     No, sir.

**Capital Reporting Company**

Page 79

1      Q      Did Sergeant Reese stay assigned to South

2    One after this incident?

3      A      No, he was momentarily moved out but I can't

4    remember exactly what date.

5      Q      Okay.  And has he since been terminated by

6    the Department?

7      A      Yes.

8      Q      Okay, all right.  Is that a final

9    determination or a final action that he's been

10   terminated?

11     A      Well, I don't know -- I can't say whether it

12   was final or not because it's something separate and

13   apart from this.

14     Q      Okay.  Do you know why he was terminated?

15     A      Could I speak to him a minute (referring to

16   his counsel, Mr. Schifferle).

17     Q      Sure, go ahead.

18            (The witness conferred with his counsel.)

19     A      Yes.

20     Q      All right, okay, why?

21     A      Domestic violence with his girlfriend.

22     Q      Okay, all right.  And was that the incident

**Capital Reporting Company**

Page 80

1    that he was convicted of a criminal offense on?

2        A    I don't know.

3        Q    Okay, all right.  Do you know when that

4    happened?

5        A    No, I can't give you an exact date; it was

6    like several months ago.

7        Q    Okay, all right.  But it was in 2007?

8        A    Yes.

9        Q    Okay, all right.  I think we're done; thank

10   you very much.

11       A    Thank you.

12            MR. SCHIFFERLE:  Do you have some interest,

13   possibly, in reviewing the transcript once it's

14   prepared?

15            THE WITNESS:  Yes.

16            MR. SCHIFFERLE:  Okay, we'll reserve on

17       that.

18                    (Whereupon, at 1:30 p.m., the

19                    deposition of STANLEY MARTIN

20                    WALDREN was concluded.)

21

22

**Capital Reporting Company**

Page 81

1                    CERTIFICATE OF NOTARY PUBLIC

2

3         I, JOSEPH KANAHELE, JR., the officer before whom

4    the foregoing deposition was taken, do hereby certify

5    that the testimony that appears in the foregoing

6    pages was recorded by me and thereafter reduced to

7    typewriting under my direction; that said

8    deposition is a true record of the proceedings;

9    that I am neither counsel for, related to, nor employed by

10   any of the parties to the action in which this

11   deposition was taken; and further, that I am not a

12   relative or employee of any counsel or attorney

13   employed by the parties hereto, nor financially or

14   otherwise interested in the outcome of this action.

15

16

17                          JOSEPH KANAHELE, JR.

18                     Notary Public in and for the

19                          District of Columbia

20

21   My commission expires: October 14, 2011

22

**Capital Reporting Company**

Page 82

1   A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3       I, STANLEY MARTIN WALDREN, do hereby acknowledge

4   that I have read and examined the foregoing pages of

5   testimony, and the same is a true, correct and

6   complete transcription of the testimony given by

7   me, and any changes or corrections, if any, appear

8   in the attached errata sheet signed by me.

9

10  _____          _____

11  DATE                       STANLEY MARTIN WALDREN

12

13

14

15

16

17

18

19

20

21

22

Page 83

1  Carl J. Schifferle, Esq. Assistant

2  Attorney General Office of the Attorney General

3  Government of the District of Columbia

4  441 4th Street, N.W. - Suite 600 South

5  Washington, D.C. 20001

6      In re:  Matthew Ingram v. District of Columbia

7  Dear Mr. Schifferle:

8      Enclosed please find your copy of the deposition

9  of STANLEY MARTIN WALDREN, along with the original

10  signature page. As agreed, you will be responsible

11  for contacting the witness regarding signature.

12      Within 30 days of receipt, please forward the

13  errata sheet and original signed signature page to Geoffrey D.

14  Allen, Esq., counsel for Plaintiff.

15      If you have any questions, please do not hesitate

16  to call.

17  Thank you.

18  Yours,

19

20  Joseph Kanahele, Jr.

21  Notary Public for the District of Columbia

22  cc:  Geoffrey D. Allen, Esq.

**Capital Reporting Company**

Page 84

1    Capital Reporting Company

2    1821 Jefferson Place, N.W. Third Floor

3    Washington, D.C. 20036

4    (202) 857-3376

5                        E R R A T A   S H E E T

6    Case: Matthew Ingram v. District of Columbia

7    Witness Name:  STANLEY MARTIN WALDREN

8    Deposition Date: Tuesday, June 12, 2007

9    Page No.    Line No.        Change/Reason for Change

10

11

12                                        `

13

14

15

16

17

18

19

20

21    _____        _____

22    DATE                        STANLEY MARTIN WALDREN