EXPERT PENOLOGIST'S REPORT

RE

*MATTHEW INGRAM, JR. V. THE DISTRICT OF COLUMBIA*

Prepared by:

E. Eugene Miller
Washington, D.C.
May 11, 2007

INTRODUCTION

I have been retained by Geoffrey D. Allen, who is serving as plaintiff's counsel in the case of *Matthew Ingram, Jr. v. The District of Columbia*. I have been asked to review various documents related to the case and determine whether or not the actions of officials and staff during an incident at the Central Detention facility (CDF) on September 27, 2005, complied with generally accepted principles, practices and standards in the field of penology (jail administration). In undertaking this task I was instructed to assume that the plaintiff's version of the events of that day is factually accurate.

This is the only written statement of my findings and opinions that I have prepared in this case. Please note that I respectfully reserve the right to amend and/or supplement this report, should I receive any additional, relevant information.

METHODOLOGY

Prior to preparing this report, I reviewed the following documents and materials:

* The "Complaint";
* "Plaintiff's Answers to District of Columbia's Interrogatories";
* "Defendant District of Columbia's Responses to Plaintiff's First Set of Interrogatories";
* Investigation concerning Melvin Reese's 2004 criminal conviction, i.e., a 09/16/05 memo from Benjamin C. Collins to File and the attachments;
* The deposition of Dancy Simpson;
* The deposition of Melvin James Reese;
* The "Daily Shift Roster" for the #2 shift on Tuesday, 09/27/05;
* The D.C. Department of Corrections "CDF Census Report - All Blocks" for 09/27/05;
* D.C. Central Detention Facility "Post Order", Housing Unit South One;
* Investigation of incident of 07/29/04 involving inmate Leonard Johnson and Sgt. Melvin Reese (Memo of 10/14/04 from Benjamin C. Collins to File and the attachments thereto);
* D.C. Department of Corrections' Program Statement Number 5010.9A, dated 04/14/00, "Use of Force and Application of Restraints";
* American Correctional Association, *2005-2007 National Jail and Adult*

-2-

* *Detention Directory;*
* American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities, Fourth Edition;*
* American Correctional Association, *2006 Standards Supplement;*
* Craig Hemmons and Eugene Atherton, *Use of Force: Current Practice and Policy;*
* James D. Henderson and W. Hardy Rauch, *Guidelines for the Development of a Security Program;*
* *D.C. Code,* Section 24-442.

It should be noted that I have been in the CDF (Central Detention Facility) on numerous occasions, including housing unit South One, which was the location of the incident, which gave rise to this litigation.

In addition to my general knowledge of the operations of the CDF and the review of the documents and materials specified above, in preparing this report I have also relied upon my more than forty-two (42) years of education, training and experience in the field of adult, institutional corrections. (Please see the accompanying *curriculum vitae* for details.)

SUMMARY OF RELEVANT FACTS

Around 11:45 a.m. on September 27, 2005, a number o inmates in housing unit South One at the CDF participated in a security event, which eventually required a number of correctional officers to respond. Mr. Ingram did not participate in the event, but rather remained peacefully in his cell. While in the process of complying with an order from Sgt. Melvin Reese to strip for a search, Sgt. Reese sprayed him with a chemical agent. Shortly thereafter, a number of officers came to his cell. Once on the tier, he was restrained with handcuffs with his hands behind his back. Officers then proceeded to beat and kick him. He was then dragged down the tier and thrown down some steps, taken to a sallyport, and beaten again. Sgt. Reese was one of the officers involved in these beatings. he was then taken to the R & D and the infirmary. He asked to have pictures taken of his multiple injuries, but this request was refused.

A camera system had been installed to record activity on the housing unit's tiers. However, either the camera system malfunctioned or the tapes have been destroyed. Furthermore, cell extractions are supposed to be recorded with a hand-held camera. The hand-held camera in

-3-

the unit (or most available to the unit) was also not working and either there was no back-up camera for this large facility or it was not requested.

Furthermore, the jail did not have a cell extraction team or emergency response team (ERT) at the time to respond to security events, but rather used regular correctional officers with no specialized training.

By reputation, Sgt. Melvin Reese was known to engage in the inappropriate and/or excessive use of force. Furthermore, in the preceding year he had been convicted on two counts of attempted threats, stemming from an incident involving Sgt. Reese and an employee working at the adjacent Correctional Treatment Facility (CTF).

FINDINGS AND OPINIONS

On September 27, 2005, Mr. Ingram was in his cell, while a security event was taking place in his housing unit, South One. Mr. Ingram was not a participant. Sgt. Reese came to his cell and ordered him to remove his clothing for a strip search. As Mr. Ingram was voluntarily complying with this order, Sgt. Reese sprayed him with a chemical agent. In this instance, Sgt. Reese's use of force served no legitimate penological purpose, since Mr. Ingram was in a compliant mode and was locked/secured in his cell, thus posing no physical threat to Sgt. Reese. Subsequently, Mr. Ingram was placed in handcuffs with his hands behind his back and remained compliant with staff's orders. Nonetheless, as he was brought onto the tier, he was beaten and kicked by other officers. He was then dragged down the tier, thrown down the stairs and beaten again in the sallyport. None of these actions by Sgt. Reese and other officers had any valid penological purpose and only served to inflict pain and injury on Mr. Ingram.

As a general principle:

> "Corrections personnel lawfully may use force
> against inmates in one of five situations. These
> include:
> * In self-defense
> * In defense of others
> * For enforcement of prison rules and regulations
> * To prevent criminal activity within the prison
> * To prevent escape."
> (Hemmons and Atherton, *Use of Force*, at page 26.)

-4-

An examination of the relevant Federal Bureau of Prisons policy may also be instructive in this regard:

> "The Bureau of Prisons authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed. When authorized, staff must use only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff, and others; to prevent serious property damage; and to ensure intituion security and good order."
> (As cited in *ibid.*, at page 8.)

Clearly neither the initial use of force against Mr. Ingram nor the subsequent physical abuse and injury inflicted upon him could meet even a single one of these justifications. Thus, it is clear that both the initial use of a chemical agent by Sgt. Reese and the subsequent beatings of Mr. Ingram by officers violated applicable penological principles and generally accepted practice. These actions also violated the following voluntary national standards in the field:

> "The use of physical force is restricted to instances of justifiable self-defense protection of others, protection of property, and prevention of escapes, and then only as a last resort...In no event is physical force used as punishment."
> (American Correctional Association, *Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition*, Standard 4-ALDF-2B-01, at page 32.)

> "Inmates are not subjected to personal abuse, corporal punishment, personal injury..."
> (*Ibid.*, Standard 4-ALDF-6A-07, at page 100.)

When trying to discover how such a wanton violation of generally practice and standards could occur, I was struck by three (3) factors. The first factor was that an alleged principal perpetrator of these misdeeds, Sgt. Reese, was inappropriately assigned to a unit, such as South One. Here was an officer, who apparently had a reputation for mistreating inmates and, who had previously been rotated out of working in South One, only to be returned there subsequently. Furthermore, in the year before this incident he had been convicted of making threats against the life of someone working at the Central Treatment Facility in a bizarre incident. And, those charges had been reduced from the initial felony charges and a domestic violence count.

-5-

(Under existing federal law, a conviction on the domestic violence charge would have prevented Sgt. Reese from working as a law enforcement r corrections officer.) If Sgt. Reese had not been assigned to South One, he could not have engaged in the unjustified and excessive use of force on Mr. Ingram. Furthermore, this misassignment of Sgt. Reese violated the following voluntary national standard:

> "Staff assigned to work directly with inmates in special management units are selected on criteria that includes:
> ...suitability for this population..."
> (*Ibid.*, Standard 4-ALDF-2A-54, at page 28.)

A second contributing factor to the incident of September 27, 2005, was the failure to have a camera or cameras recording the event. cameras had been installed specifically to record activity on the tiers in this housing unit. On the date in question the cameras were either inoperable or the tape was destroyed. Furthermore, the D.C. Department of Corrections's own Program Statement on the use of force (Number 5010.9a, dated 04/14/00) requires that:

> "Any planned use of force such as a cell extraction shall be directly supervised by a Lieutenant or higher ranking official who shall:
> ... [redacted]
> (At page 4, d.(3).)

The incident was not videotaped nor was a report submitted explaining why it was not. A jail as large as CDF should have several hand-held cameras for use in such circumstances, to include a back-up camera in case of a malfunction with the principal camera being used.

Some of the reasons why a camera or cameras should be used include:

> "Videotape serves the purpose of documenting the incident, to be used as a defense to inmate

-6-

> priate conduct when they are aware that their
> actions are being recorded for review by super-
> visors..."
> (Hemmens and Atherton, *Use of Force*, at page 46.)

Videotaping can also sometimes serve to rein in untoward inmate conduct, as inmates may be wary of doing something that may result in an additional charge. It is also useful as a staff training tool.

In this particular instance, officers may have been reluctant to beat and abuse Mr. Ingram, if they knew that their actions were being recorded and preserved on videotape. The existence of such a tape could also be used to quickly ascertain the validity of Mr. Ingram's allegations.

By September, 2005, the use of videotape to record cell extractions and responses to security events was generally accepted practice in major urban jails throughout the country. **Furthermore, the failure to videotape this incident was also a clear violation of the D.C. Department of Corrections's own policy on the use of force.**

Many large urban jails have created cell extraction and/or emergency response teams (ERTs). These consist of select officers, who receive special training on a regular basis in individual and group techniques to deal with unruly inmates in a variety of situations. While several mega jail systems have staff, who are posted to these times as a full-time assignment, most jails carefully assign the team members to regular posts on the various shifts, to be assembled quickly on an as-needed basis. In other words, ERT members working different posts on a shift can be assembled quickly at a predesignated location to gather their equipment and proceed to that part of the facility, where the problem is occurring. **Neither the CDF nor the Department of Corrections as a whole had an ERT or cell extraction team at the time of this incident.**

-7-

With regard to the generally accepted practice of having a specialized cell extraction team/ ERT, Hemmens and Atherton remark that:

> "...Current practice is much more effective, and
> safer for everyone involved..."
> (*Use of Force*, at page 72.)

> "...Once the team is presented to the inmate, the
> inmate may well become cooperative in response
> to the presence of the team. Otherwise, the inmate
> is normally restrained through empty-handed control
> as the team enters the cell..."
> (*Ibid.*, at page 72.)

The use of a well-trained, specialized team, whose actions are videotaped, to effect cell extractions and restore order to an unruly housing unit is far less likely to result in the type of untoward and undisciplined conduct toward inmates, that is alleged in this case.

Mr. Ingram alleges that, after this incident was over, he requested that his injuries be photographed. His request was denied. It is the generally accepted practice in the field of penology to photograph and otherwise document injuries incurred by inmates and staff during an incident. Furthermore, the failure to take such photographs not only violated the generally accepted practice, but also the D.C. Department of Corrections's own procedures, specifically:

> "...photos shall be taken of any inmate who requires
> medical assessment or treatment for injuries sustained
> as a result of an incident, including but not limited to,
> an assault, a physical altercation or an accident."
> (Operations Memorandum, Number 06-003, "Photo
> graphing Inmate Injuries", 3.a.)

## STATEMENT OF COMPENSATION

I am being compensated at a rate of $175.00 per hour to review various documents related to this case and prepare this report. Time spent testifying at trial at a deposition will be billed at a daily rate of $1,400. To date, I have received a retainer of $500.00.

E. Eugene Miller                                                                May 11, 2007